# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FIRST INVESTMENT CORPORATION**<br>**OF THE MARSHALL ISLANDS** | **CIVIL ACTION** |
| | **No. 09-3663** |
| **VERSUS** | **SECTION I** |
| **FUJIAN MAWEI SHIPBUILDING, LTD.**<br>**OF THE PEOPLE'S REPUBLIC OF**<br>**CHINA, ET AL.** | |

### ORDER AND REASONS

Before this Court is a motion[1] to dismiss or, in the alternative, to refuse to confirm an arbitral award filed by respondents, Fujian Mawei Shipbuilding Ltd. ("Mawei") and Fujian Shipbuilding Industry Group Corp. ("the Fujian Group") (collectively, "the Fujian respondents"). Petitioner, First Investment Corporation of the Marshall Islands ("FIC") has filed an opposition.[2] For the following reasons, the motion to dismiss is **GRANTED**.

### *BACKGROUND*

FIC filed this action to confirm a foreign arbitral award pursuant to the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("the New York Convention").[3] FIC obtained the award against the Fujian Group, a Chinese state-owned entity, and Mawei, a private corporation that is majority-owned by the Fujian Group.[4] The underlying dispute arose from a series of shipbuilding contracts with options to purchase additional vessels from the Chinese entities.[5] When the Fujian Group and Mawei

---

[1] R. Doc. No. 43.

[2] R. Doc. No. 48.

[3] R. Doc. No. 1.

[4] R. Doc. No. 48-3, p.3.

[5] R. Doc. No. 1, pp.3-4.

refused to honor the option agreements unless the terms were amended, FIC submitted the dispute to arbitration.[6]  The contracts required that any disputes be arbitrated in London pursuant to the terms of the London Maritime Arbitrators Association (LMAA) and in accordance with English law.[7]

The arbitration panel was duly constituted on June 18, 2004.[8]  It consisted of three persons: Bruce Harris ("Mr. Harris"), appointed to the panel by FIC, Dr. Wang Sheng Chang ("Dr. Wang"), appointed to the panel by the Fujian Group and Mawei, and Professor J. Martin Hunter ("Professor Hunter"), who was jointly selected as the third arbitrator by Mr. Harris and Dr. Wang.[9]  Professor Hunter presided over the arbitration as the chief arbitrator.[10]  The tribunal held its initial hearing at the International Dispute Resolution Center in London, England from June 20, 2005, to June 24, 2005.[11]  After extensive submissions by the parties and a second hearing held in London on September 17, 2005, the arbitration concluded and the panel commenced deliberations.[12]

On September 22, 2005, Professor Hunter expressed his opinion that the panel would need to meet for their deliberations before issuing a final award.[13] Dr. Wang prepared a deliberations memorandum setting forth his perspective on certain issues in anticipation of the

---

[6] *Id.*

[7] *Id.* at 4-5.

[8] *Id.* at 5-6.

[9] *Id.* at 5.

[10] *Id.*

[11] *Id.* at 6.

[12] *Id.* at 6; R. Doc. No. 48.

[13] R. Doc. No. 43-1, p. 21; R. Doc. No. 43-12, p. 1("I believe we will almost certainly need to have a deliberations meeting of the three of us before we reach our decision on this issue.").

discussions.[14]  Professor Hunter took his comments into consideration in preparing a first draft of the award that he circulated back to Dr. Wang and Mr. Harris for comments.[15]  Dr. Wang returned a draft of his dissenting opinion along with his own comments.[16]  When Professor Hunter related his concern that in-person discussions would be necessary if the arbitrators could not agree on certain issues, Dr. Wang replied that he would agree to finalize the award via email, if possible, but that he would be available to meet in London in April, 2006.[17]

On March 25, 2006, Professor Hunter circulated a second draft of the award to Dr. Wang and Mr. Harris that incorporated all of the amendments proposed by Dr. Wang and Mr. Harris, "together with some consequential drafting changes resulting both from the existence and content of Dr. Wang's draft dissenting opinion."[18]  After some final proofreading changes by Mr. Harris, the award was finalized on March 31, 2006 and circulated to the panelists for signature.[19]  Unfortunately, Dr. Wang received neither the second draft of the award nor the finalized version because he had been indefinitely detained by Chinese authorities on March 20, 2006.[20]

On May 3, 2006, Professor Hunter sent a letter to the parties informing them that he believed the final award could be issued without Dr. Wang's signature.[21]  Professor Hunter stated that the arbitration panel had reached its determination of the substantive issues by a majority

---

[14] R. Doc. No. 43-1, p. 21; R. Doc. No. 43-12, p. 3.

[15] R. Doc. No. 43-1, p. 21-22; R. Doc. No. 43-12, p.2.

[16] R. Doc. No. 43-13 ¶ 7.

[17] R. Doc. No. 43-12, pp. 4-5, 6-7.

[18] R. Doc. No. 43-13, ¶ 8.

[19] *Id.* at ¶ 9.

[20] R. Doc. No. 43-1, pp. 22-23.

[21] R. Doc. No. 43-13, pp. 68-69.

after an extensive period of deliberations.[22]  Professor Hunter believed that Dr. Wang had

participated fully in the deliberations and he informed the parties that Dr. Wang had indicated

that he would sign the majority award under reserve of his dissenting opinion.[23] Although

counsel for the Fujian Group and Mawei disagreed with Professor Hunter that Dr. Wang had

participated fully in the deliberations, the final award was made by the truncated tribunal on June

19, 2006, signed only by Professor Hunter and Mr. Harris.[24]

Professor Hunter and Mr. Harris addressed the problem of the panel's composition in

Procedural Order No. 8, which was issued on the same day as the final award.[25]  After

recognizing that English arbitration law is silent on the issue of truncated tribunals, the

arbitrators looked to the agreement of the parties to assess the validity of a final award issued by

---

[22] *Id.*

[23] *Id.*

[24] *Id.* at 70-71.  The final award signed by Professor Hunter and Mr. Harris contained the following dispositive provisions:

> (203)  The Nominees (the 2nd to 9th Claimants) are not proper parties to the proceedings and are dismissed from the arbitration by this Award.
>
> (204) The Respondents shall pay to the First Claimant, FIC, the sum of US $26.4 million as damages for breach of the Option Agreement
>
> (205) The Respondents shall pay to FIC interest on the said sum of US $26.4 million from 1 May 2004 to the date of payment of the sums due under this Award at the rate of 4.50% *per annum*, compound with three-monthly rests
>
> (206) The liability of the Respondents under this Award shall be joint and several as joint signatories to the Option Agreement.
>
> (207) In the event that the parties are unable to agree as to the allocation and/or quantum of the costs incurred in the arbitration, these issues will be determined by the Arbitration Board in a separate later award.
>
> (208) This Award was made by a majority of the Arbitration Board and, in accordance with the Parties' arbitration agreement, is final, conclusive and binding on them.

*Id.* at 67.

[25] *Id.* at 68-72.

only two of the three arbitrators.[26]  The arbitrators noted that Paragraph 8(c) of the LMAA states,

"After the appointment of the third arbitrator decisions, orders or awards shall be made by all or

a majority of the arbitrators."[27]  The arbitrators concluded that

> [h]aving taken account of the submissions received from the Parties, and taking account of the fact that the Arbitration Board had completed its deliberations on the substantive issues in the dispute . . . the majority determines that the proper course is for the Award to be "made" by inserting a date in the signature block and then, as expressly required by the parties' arbitration agreement, notifying it to the Parties immediately.[28]

The arbitrators recognized that they had previously contemplated the need for an in-

person meeting to complete their deliberations.[29]  However, they explained in a footnote of the

procedural order that

> [t]he possibility of further deliberations at an in person meeting was discussed but (in an electronic letter dated 16 February 2006) Dr. Wang made it clear that, although he would be willing to attend such a meeting, the award could be issued more quickly if the Majority made the award with his dissenting opinion attached.[30]

Accordingly, Professor Hunter and Mr. Harris concluded that the award could be made without

the signature of Dr. Wang as he had participated fully in the deliberations of the matter.[31]

On December 5, 2006, FIC commenced a confirmation action in Xiamen Maritime Court

to enforce the award against the Fujian Group and Mawei.[32]  After hearing the matter on July 13,

---

[26] *Id.* at 69.

[27] *Id.*

[28] *Id.* at pp. 70-71.

[29] *Id.* & n. 2.

[30] *Id.*

[31] *Id.* The Fujian respondents did not appeal the jurisdiction of the remaining arbitrators to make the award in the courts of the United Kingdom.  R. Doc. No. 48, pp. 4, 22.

[32] R. Doc. No. 43-13, pp. 1-2.

2007, the Court, on May 11, 2008, issued an order refusing to enforce the award.[33]  The Court agreed with the Fujian respondents that the composition of the arbitral panel was not in accordance with the agreement of the parties.[34]  The Court found that the LMAA and English law called for the participation of all three arbitrators at every stage of decision making by the tribunal.[35]  Although the Court recognized that a final award could be signed and issued by a majority pursuant to Paragraph 8(c) of the LMAA, the Court explained that

> the factual condition for Paragraph 8(e) of the LMAA rules to apply is that each member of the tribunal has fully participated in the arbitration proceedings.  On this premise, and on this premise only, may decisions, orders or awards be made by the majority of arbitrators under the LMAA rules.  Failing this premise, the majority has no powers to do so.[36]

On the basis of that interpretation of the relevant law, the Court held that Dr. Wang had not fully participated in the arbitration proceedings as he had been detained before the deliberations came to an end.[37]  Although the Court acknowledged that Dr. Wang was willing to sign the first draft of the award under reserve of his dissent, the Court explained that the use of the term "draft" indicated that his review of the first draft was not completed.[38]  The Court also found that the circulation of a second draft to Dr. Wang and Mr. Harris for additional comments proved that their deliberation of the issues was ongoing at the time of Dr. Wang's detention.[39]  Because Dr. Wang never received a copy of the second draft of the award, and never had an

---

[33] *Id.* at 2, 16.

[34] *Id.* at 13-16.

[35] *Id.* at 14.

[36] *Id.*

[37] *Id.* at 14-15.

[38] *Id.*

[39] *Id.*

opportunity to provide comments prior to the truncated panel's issuance of the final award, the Court concluded that the arbitral award was not reached in accordance with the agreement of the parties.[40] Consequently, the Court refused to confirm the award pursuant to Article V of the New York Convention.[41]

On May 27, 2009, FIC filed its petition in this Court to confirm the arbitral award.[42] In this proceeding, FIC seeks to enforce the award not only against the Fujian Group and Mawei, but also against the People's Republic of China ("the PRC" or "China"), which was not a party to the arbitration.[43] This Court initially entered a judgment confirming the arbitral award against those parties on January 26, 2010.[44] It later vacated that order having found that the parties had not been served in accordance with Rule 4(h) of the Federal Rules of Civil Procedure, the Hague Convention, and the Foreign Sovereign Immunities Act.[45]

On March 22, 2011, this Court entered a second judgment confirming the arbitral award.[46] FIC subsequently agreed to have the Court set aside the default judgment against the Fujian Group and Mawei in exchange for waiver of any service-related objections.[47] This Court vacated its judgment against the Fujian Group and Mawei, but it ordered that an entry of default be entered as to China.[48] The Court stated that FIC would be permitted to move for a default

---

[40] Id.

[41] *Id*. at 14-16.

[42] R. Doc. No. 1.

[43] *Id.*

[44] R. Doc. No. 7.

[45] R. Doc. No. 14.

[46] R. Doc. No. 23.

[47] *See* R. Doc. No. 40.

[48] *Id.*

judgment against China in accordance with 28 U.S.C. § 1608(e) following resolution of the Fujian Group and Mawei's objections to the validity of the arbitral award.[49]

On July 12, 2011, the Fujian respondents filed the present motion to dismiss the case or, in the alternative, to refuse to confirm the arbitral award.[50]  The Fujian respondents argue that the action should be dismissed because the Court lacks personal jurisdiction over the Fujian Group and Mawei.[51] The Fujian respondents also argue that the case should be dismissed pursuant to the doctrine of *forum non conveniens*.[52]  The Fujian respondents urge the Court, in the alternative, to refuse to confirm the arbitration award for the reasons expressed by the Xiamen Maritime Court.[53]  For the following reasons, this Court agrees that it lacks personal jurisdiction over the Fujian Group and Mawei.  This Court also finds that it lacks subject matter jurisdiction to enforce the award against China and, as such, it declines to reach the merits of the petition to enforce the arbitral award.

*LAW*

## I.  Personal Jurisdiction

In the context of a motion filed pursuant to Federal Rule of Civil Procedure 12(b)(2), a plaintiff must establish a court's personal jurisdiction over the defendant.  *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994).  Where, as here, the Court rules without conducting an evidentiary hearing, the plaintiff bears the burden of establishing a *prima facie* case that the Court has jurisdiction over a defendant.  *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir.

---

[49] *Id.*

[50] R. Doc. No. 43.

[51] *Id.*

[52] *Id.*

[53] *Id.*

2008).[54]  If the defendant disputes the factual bases for jurisdiction, "the court may receive interrogatories, depositions, or any combination of the recognized methods of discovery to help it resolve the jurisdictional issue." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (citations and quotations omitted).  The court should not, however, act as a fact finder and it must construe all disputed facts in the plaintiff's favor.  *Id.*

A federal court may exercise personal jurisdiction over a nonresident defendant if (1) statutory authority exists for the exercise of such jurisdiction, and (2) the exercise of jurisdiction complies with federal constitutional standards of due process.  *See Moncrief Oil Int'l v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007).  To the extent that this Court must look to the forum state's long-arm statute to find personal jurisdiction, the Court need only consider the second step of the inquiry as "the limits of the Louisiana long-arm statute are coextensive with constitutional due process limits" *Walk Haydel*, 517 F.3d at 242-43 (citing *A & L Energy, Inc. v. Pegasus Group*, 791 So.2d 1266, 1270 (La. 2001)).

"As interpreted by the Supreme Court, the Fourteenth Amendment Due Process clause requires satisfaction of a two-prong test in order for a federal court to properly exercise jurisdiction: (1) the nonresident must have minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction must be consistent with 'traditional notions of fair play and substantial justice.' " *Freudensprung v. Offshore Tech. Serv., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (citing *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784 (5th Cir. 1990) and *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)).

---

[54] While the plaintiff must ultimately demonstrate that jurisdiction is proper by a preponderance of the evidence, courts are permitted to defer the resolution of that question until trial to allow it to be resolved along with the merits. *See Walk Haydel & Assocs., Inc. v. Coastal Power Production Co.*, 517 F.3d 235, 241 (5th Cir. 2008).

"The 'minimum contacts' prong is further subdivided into contacts that give rise to specific jurisdiction and those that give rise to general jurisdiction." *Freudensprung*, 379 F.3d at 343.

> Where a defendant "has continuous and systematic general business contacts" with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S. Ct. 1868, 80, L. Ed. 2d 404 (1984), the court may exercise "general jurisdiction" over any action brought against the defendant. *Id.* at 414, 204 S. Ct. 1868 n.9. Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 414, 104 S. Ct. 1868, n.8.

*Luv N' care, Ltd., v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir.2006).

## A. Specific Jurisdiction

The Fifth Circuit follows a three-step analysis for specific jurisdiction.[55] First, the Court must determine "whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there."[56] *Nuivo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002). The "minimum contacts" inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it "reasonably anticipates being haled into court" in the forum state. *Luv N' care*, 438 F.3d at 470 (quoting *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)). "Random, fortuitous, or attenuated contacts are not sufficient to establish

---

[55] Specific personal jurisdiction is a claim specific inquiry. "A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each of them . . . . the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006).

[56] "The 'minimum contacts' requirement can be established through contacts sufficient to assert either specific or general jurisdiction." *Kelly v. Syria Shell Petroleum Dev. B. V.*, 213 F.3d 841 (5th Cir. 2000).

jurisdiction." *Moncrief Oil*, 481 F.3d at 312 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).

Second, the Court considers "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts." *Nuivo Pignone*, 310 F.3d at 378. The proper focus of the personal jurisdiction analysis is on the "relationship among the defendant, the forum, and the litigation." *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008).

Last, "[i]f the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise of jurisdiction would be unfair or unreasonable." *Seiferth*, 472 F.3d at 271 (citing *Burger King*, 471 U.S. at 482). In this inquiry the Court analyzes five factors: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' care*, 438 F.3d at 473. "It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *Johnston*, 523 F.3d at 615 (citing *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)). "The relationship between the defendant and the forum must be such that it is reasonable to require the defendant to defend the particular suit which is brought there." *Id.* (quoting *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 630 (5th Cir. 1999).

## B. General Jurisdiction

Where specific jurisdiction is lacking, a court may nevertheless exercise "general jurisdiction" based on a defendant's contacts with the forum unrelated to the controversy. *Helicopteros Nacionales*, 104 S. Ct. at 1872. "To exercise general jurisdiction, the court must determine whether the contacts are sufficiently systematic and continuous to support a

reasonable exercise of jurisdiction." *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir.

1986). "General jurisdiction can be assessed by evaluating contacts of the defendant with the

forum over a reasonable number of years, up to the date the suit was filed." *Johnston*, 523 F.3d at

610  (citing *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999)).

"The contacts must be reviewed in toto, and not in isolation from one another." *Id.*  (citing *Holt*

*Oil*, 801 F.2d at 779)). "[V]ague and overgeneralized assertions that give no indication as to the

extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Id.*  As

with specific jurisdiction, after the plaintiff makes such showing, the burden shifts to the

defendant to defeat jurisdiction by showing that its exercise of jurisdiction would be unfair or

unreasonable.  *Id.* at 615.

## II.  Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and possess power over only those cases

authorized by the United States Constitution and federal statutes.  *Coury v. Prot*, 85 F.3d 244,

248 (5th Cir. 1996).  A lack of subject matter jurisdiction may be raised at any time during the

pendency of the case by any party or by the court.  *See Kontrick v. Ryan,* 540 U.S. 443, 456, 124

S. Ct. 906, 157 L. Ed. 2d 867 (2004) ("A litigant generally may raise a court's lack of subject-

matter jurisdiction at any time in the same civil action, even initially at the highest appellate

instance."); *McDonal v. Abbott Labs.*, 408 F.3d 177, 182 n.5 (5th Cir. 2005) ("[A]ny federal

court may raise subject matter jurisdiction *sua sponte*.").

A motion to dismiss for lack of subject matter jurisdiction should be granted "only if it

appears certain that the plaintiff cannot prove any set of facts in support of his claim that would

entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To

assess whether subject matter jurisdiction exists, this Court may look to the complaint and the

undisputed facts in the record. *See id.* When analyzing the complaint, this Court will take the allegations in the complaint as true. *Sawar P'ship v. United States*, 67 F.3d 567, 569 (5th Cir. 1995). Because the burden of proof on a motion to dismiss for lack of subject matter jurisdiction is on the party asserting jurisdiction, plaintiff "constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161 (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

## *ANALYSIS*

## I. Personal Jurisdiction over the Fujian Respondents

The Fujian respondents argue that the claims against the Fujian Group and Mawei should be dismissed for lack of personal jurisdiction. Although the New York Convention provides that federal district courts have original jurisdiction over actions to compel or confirm arbitration awards, "it does not confer personal jurisdiction when it would not otherwise exist." *Base Metal Trading Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 212-13 (4th Cir. 2002). *See also Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1120-23 (9th Cir. 2002); *Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 397-98 (2d Cir. 2008). As previously explained, personal jurisdiction may only be exercised over the Fujian respondents if: (1) statutory authority exists for the exercise of such jurisdiction, and (2) the exercise of jurisdiction complies with federal constitutional standards of due process. *See Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008); *see also GSS Group Ltd. v. Nat'l Port Auth.*, 774 F. Supp. 2d 134, 137 (D.D.C. 2011).

## A. Statutory Authority

The parties do not contest the fact that statutory authority exists for exercising jurisdiction over the Fujian Group. Federal Rule of Civil Procedure 4(k) provides:

**(1)** ***In General.*** Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:

**(A)** who is subject to the jurisdiction of a Court of general jurisdiction in the state where the district Court is located;

**(B)** who is a party joined under Rule 14 or 19 and is served within a judicial district of the United States and not more than 100 miles from where the summons was issued; or

**(C)** when authorized by a federal statute.

Personal jurisdiction over the Fujian Group is authorized in this case by a federal statute: the Foreign Sovereign Immunities Act ("FSIA"). The FSIA authorizes the exercise of personal jurisdiction over a "foreign state," as to "any claim for relief in personam with respect to which the foreign state is not entitled to immunity . . . ." 28 U.S.C. § 1330. The term "foreign state" is defined as follows:

**(a)** A "foreign state," except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

**(b)** An "agency or instrumentality of a foreign state" means any entity—

**(1)** which is a separate legal person, corporate or otherwise, and

**(2)** which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

**(3)** which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603.

The Fujian Group falls within the definition of a "foreign state" as an "agency or instrumentality of a foreign state." *See* 28 U.S.C. § 1603(b). First, it is a separate legal person, corporate or otherwise. *See* 28 U.S.C. § 1603(b)(1). Second, as a state-owned entity, all of its shares or other ownership interest are owned directly by the People's Republic of China. *See* 28

14

U.S.C. § 1603(b)(2). Third, the Fujian Group is neither a citizen of a State of the United States, nor created under the laws of any third country. *See* 28 U.S.C. § 1603(b)(3). As the FSIA waives immunity with respect to actions brought to confirm arbitral awards, 28 U.S.C. § 1605(a)(6), and the parties do not dispute that the Fujian Group was properly served with process, statutory authority for exercising personal jurisdiction over that entity has been established pursuant to the FSIA. 28 U.S.C. § 1330(b); *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981) (explaining that under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction") *overruled on other grounds by Frontera*, 582 F.3d at 398-400.

However, the FSIA does not provide a statutory basis for exercising personal jurisdiction over Mawei because that entity does not fall within the definition of an "agency or instrumentality of a foreign state." Although China owns the Fujian Group, which in turn owns a majority interest Mawei, "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474, 123 S. Ct. 1655, 1660 155 L. Ed. 2d 643 (2003). The Court must instead determine whether the Louisiana long-arm statute authorizes the exercise of personal jurisdiction over Mawei. Fed. R. Civ. P. 4(k)(1)(A). As the limits of the Louisiana long-arm statute are coextensive with constitutional due process limits,[57] this Court has statutory authority to exercise personal jurisdiction over Mawei to the extent of its constitutional authority. *See Walk Haydel*, 517 F.3d at 242-43 (citing *A & L Energy, Inc. v. Pegasus Group*, 791 So. 2d 1266, 1270 (La. 2001)). Therefore, this Court

---

[57] La. Rev. Stat. Ann. § 13:3201 provides in relevant part that "a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States."

will proceed to consider whether it possesses constitutional authority to exercise personal jurisdiction over the Fujian respondents.

## B. Constitutional Authority

### 1. Due Process Analysis

The Fujian respondents assert that this Court cannot exercise jurisdiction over the Fujian Group and Mawei consistent with the constitutional requirements of due process. Guan Junbin, the vice general manager of Mawei, and Chen XiuXiang, the vice director of the Fujian Group's legal department, attest that neither entity has purchased or supplied products in the United States, possessed any property or bank accounts in the United States, maintained a phone number or mailing address in the United States, participated in legal proceedings in the United States, or conducted any transaction in the United States forming the basis for the underlying contract dispute.[58] FIC does not dispute those facts. Nor does it allege that its cause of action is related to any purposeful contact by the Fujian respondents with this forum sufficient to establish specific jurisdiction. There is no indication that the Fujian respondents otherwise engaged in "continuous and systematic contacts" sufficient to support the exercise of general jurisdiction. Accordingly, the Court agrees with the Fujian respondents that it may not exercise personal jurisdiction over the Fujian Group or Mawei consistent with the constitutional requirements of due process.

### 2. Whether the Fujian Respondents are Entitled to Due Process

FIC argues that this Court may nonetheless exercise jurisdiction over the Fujian respondents because they are not "persons" entitled to constitutional due process. The Due Process Clause of the Fifth Amendment provides that "[n]o *person* shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V (emphasis added).

---

[58] R. Doc. Nos. 43-5, 43-11.

Given that a "State of the Union" is not a "person" as that term is used in the Due Process Clause, *See South Carolina v. Katzenbach,* 383 U.S. 301, 323-24, 86 S. Ct. 803, 15 L. Ed. 2d 769 (1966), the D.C. Circuit Court of Appeals in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002) held that "it would make no sense to view foreign states as 'persons' under the Due Process Clause."[59] In *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 299-301 (D.C. Cir. 2005), the Court extended that reasoning to encompass government instrumentalities that are controlled by a foreign sovereign. The Court explained that when a foreign state exerts sufficient control over a government instrumentality, "there is no reason to extend to the [entity] a constitutional right that is denied to the sovereign itself." *Id.* The U.S. Second Circuit Court of Appeals has since joined the D.C. Circuit in reaching that conclusion. *Frontera*, 582 F.3d at 399-400 (overruling *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981)).

FIC relies on this line of cases for its argument that the Fujian Group and Mawei are not entitled to due process because they are "controlled" by China. Assuming that foreign states are not "persons" entitled to due process under the constitution as FIC proposes, *see Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992) (assuming without deciding that a foreign state is a person for purposes of the Due Process Clause but citing its decision in *Katzenbach*), this Court agrees with the reasoning of the D.C. Circuit and the Second Circuit that disregarding the separate juridical status of the Fujian Group and Mawei for the purposes of the Fifth Amendment would necessarily require a careful application of the Supreme Court's teachings in *First National City Bank v. Banco Para el*

---

[59] The Court reasoned that "in common usage, the term 'person' does not include the sovereign." *Price*, 294 F.3d at 96 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). The Court explained that "Given th[e] fundamental dichotomy between the constitutional status of foreign states and States within the United States, we cannot perceive why the former should be permitted to avail themselves of the fundamental safeguards of the Due Process Clause if the latter may not." *Id.* at 97.

*Comercio Exterior de Cuba*, 462 U.S. 611, 103 S. Ct. 2591, 77 L. Ed. 2d 46 (1983) ("Bancec").

*See TMR Energy*, 411 F.3d at 301; *Frontera*, 582 F.3d at 400 ("Although *Banco* asked when a

state instrumentality can be treated like its state for 'the attribution of liability,' we think, as the

D.C. Circuit did in *TMR Energy*, that *Bancec's* analytic framework is also applicable when the

question is whether the instrumentality should have due process rights to which the state is not

entitled.") (citation omitted); *Walter Fuller*, 965 F.2d at 1382 ("The broader principles upon

which *Bancec* was based . . . are undoubtedly relevant whenever a plaintiff seeks to disregard a

foreign government instrumentality.").

    In *Bancec*, the Supreme Court established the principle that instrumentalities of foreign

governments are presumed to retain their separate juridical status. *Bancec*, 462 U.S. at 623-34.

That presumption may be overcome when "a corporate entity is so extensively controlled by its

owner that a relationship of principal and agent is created" or "when to do so would work fraud

or injustice." *Id.* at 629. [60] Although no mechanical formula exists for determining whether or

not to disregard a foreign government instrumentality, *id.* at 633, the Fifth Circuit has applied the

*Bancec* analysis by "look[ing] to the ownership and management structure of the instrumentality,

paying particularly close attention to whether the government is involved in day-to-day

operations, as well as the extent to which the agent holds itself out to be acting on behalf of the

government." *Walter Fuller Aircraft Sales, Inc. v. Republic of Phil.*, 965 F.2d 1375, 1382(5th

Cir. 1992) (citing *Hester Intern. Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 178, 181 (5th

Cir. 1989)). The determination is highly fact driven and cannot be determined simply on the

basis that a foreign state is the sole owner of its instrumentality and appoints the board of

---

[60] The Court in *Bancec* explained that the governing principles are "common to both international law and federal common law, which in these circumstances is necessarily informed both by international law principles and by articulated congressional policies." *Bancec*, 462 U.S. at 623. The Fifth Circuit has recognized that the analysis in *Bancec* "freely drew from American corporate law . . . [and] specifically declined to apply the law of the chartering state to determine the separate juridical status of its instrumentality." *Hester*, 879 F.2d at 177.

directors.  *Hester*, 879 F.2d at 181.  The broad equitable principles established in *Bancec* require

that "government instrumentalities established as juridical entities distinct and independent from

their sovereign should normally be treated as such." *Bancec*, 462 U.S. at 626-27.

The Court in *Bancec* was careful to recognize the importance of respecting the separate

status of government instrumentalities.  The Court noted the features of a "typical government

instrumentality" as one that is

> created by an enabling statute that prescribes the powers and duties
> of the instrumentality, and specifies that it is to be managed by a
> board selected by the government in a manner consistent with the
> enabling law. The instrumentality is typically established as a
> separate juridical entity, with the powers to hold and sell property
> and to sue and be sued. Except for appropriations to provide capital
> or to cover losses, the instrumentality is primarily responsible for
> its own finances. The instrumentality is run as a distinct economic
> enterprise; often it is not subject to the same budgetary and
> personnel requirements with which government agencies must
> comply.

The Court warned that "freely ignoring the separate status" of such instrumentalities,

> would result in substantial uncertainty over whether an
> instrumentality's assets would be diverted to satisfy a claim against
> the sovereign, and might thereby cause third parties to hesitate
> before extending credit to a government instrumentality without
> the government's guarantee.  As a result, the efforts of sovereign
> nations to structure their governmental activities in a manner
> deemed necessary to promote economic development and efficient
> administration would surely be frustrated.

In this case, the Chinese government's level of control over the Fujian respondents will

determine FIC's ability to distinguish the Fujian Group and Mawei from the typical government

instrumentality described in *Bancec*.  If the presumption cannot be overcome that the Fujian

Group and Mawei are juridical entities separate and distinct from the PRC, "the notion that the

minimum contacts test must be satisfied before a court can exercise personal jurisdiction over a

foreign nonresident defendant . . . is enshrined in law." *GSS Group Ltd. v. Nat'l Port Auth.*, 774 F. Supp. 2d 134, 139 (D.D.C. 2011).

FIC submitted the declarations of Wang Darong[61] and Lin Jiang,[62] attorneys licensed and practicing law in Shanghai, China, attesting to their assertion that the Fujian respondents are "controlled" by the PRC.[63] Mr. Wang attests to the fact that the Fujian Group is a state-owned entity created to manage government assets.[64] Mr. Wang states that the Fujian Group possesses operational and managerial authority over its assets, but that it does not have any actual ownership rights.[65] According to Mr. Wang, the Board of Directors and senior management personnel are appointed by the Fujian Provincial State-Owned Assets Supervision and Administration Commission (SASAC), which performs the shareholder ("contributor") functions

---

[61] Mr. Wang is a partner in the law firm of Pan Young & Co., Room 701, No. 2 Building, Hui Yang Mansion, No. 1139 Pudong Avenue, Shanghai, 200135, the People's Republic of China. R. Doc. No. 34-1, ¶ 1. Mr. Wang states that he made his declaration based upon his own personal knowledge and upon documents that he believes are true and accurate. *Id.* He further states that he reached his conclusions after conducting an independent search against the Fujian Group and Mawei at the Administration for Industry and Commerce of Fujian Province on May 3-4, 2011. *Id.* at ¶ 2. Mr. Wang attests that his conclusions are based upon a review of various business licenses, certificates of registration by the Fujian Provincial People's Government listing state-owned entities in which it had invested, government notices regarding the appointment and dismissal of senior management officials, articles of association, and other documents examined in light of various Chinese laws and regulations. *Id.* at ¶¶ 3-12.

[62] Mr. Lin is partner of the law firm of Hisun & Co., Room 905, Jin Tao Mansion, 1900 Shang Cheng Road, Shanghai, 200135, the People's Republic of China. R. Doc. No. 48-1, ¶ 1. Mr. Lin states that he is a qualified and licensed English solicitor and Chinese lawyer. He further states that he is an arbitrator of the Shanghai Arbitration Commission, a supporting member of the London Maritime Arbitrators' Association, and a law lecturer of Shanghai Maritime University. *Id.* Mr. Lin attests that he made his declaration based upon his own personal knowledge and upon documents that he believes are true and accurate. *Id.* He further states that he reached his conclusions after reviewing the documentation produced by Wang Darong and Lin Yuan Min. Mr. Lin also relied on documents obtained from the official websites of the State Administration for Industry and Commerce of the People's Republic of China and the Fujian Provincial People's Government and other internet sources on September 1, 2011. *Id.* at ¶¶ 2-3.

[63] *See* R. Doc. No. 34-1, ¶¶ 4, 28; R. Doc. No. 48-1, ¶¶ 4, 29.

[64] R. Doc. No. 34-1, ¶¶ 5-12, 15.

[65] *Id.* Mr. Wang attests that "[i]n accordance with the Constitution, the Civil Law, the Law of IEOWP and the Law of SAE, all of FSIGC's property is owned by the whole people of the PRC, i.e., it is owned by the State; FSIGC itself possesses only the operational and managerial authority over the property, but does not have any ownership rights." *Id.* at ¶ 15.

on behalf of the government.[66]  Mr. Wang notes that the issuance of shares of the Fujian Group are controlled by the Fujian Province Government, and that the public has no ability to purchase shares in the Fujian Group.[67]  Mr. Wang concludes from this information that the Fujian Group and its assets are 100% owned by the PRC and that it is actually and directly controlled by the Fujian People's Government.[68]

Mr. Lin agrees with Mr. Wang that the Fujian Group is a state-owned entity that operates and manages government assets.[69]  He also agrees that the State has the ability to appoint the Board of Directors and senior management.[70]  Mr. Lin explains that the appointment and removal of government personnel to managerial posts in the Fujian Group complies with Articles 63-65 of the Civil Servant Law of the PRC.[71]  Mr. Lin notes that the former legal representative of the Fujian Group simultaneously served as the Deputy of Fujian Province Economic and Trade

---

[66] *Id.* at ¶¶ 17(1), (2). Mr. Wang supports his conclusion by reference to article 22 of the State-owned Assets of Enterprise ("SAE") and to articles 11-12 of the Articles of Association of Fujian Shipbuilding Industry Group Corporation.  Article 22 of the SAE provides, among other things,

> A body performing the contributor's functions shall, according to laws, administrative regulations and enterprise bylaws, appoint or remove, or suggest the appoint or removal of the following personnel of a state-invested enterprise (1) . . . the president, vice-presidents, person in charge of finance and other senior managers of a wholly state-owned enterprise; (2) . . . the chairman and vice-chairmen of the board of directs, directors, chairman of the board of supervisors, and supervisors of a wholly state-owned company . . . .

R. Doc. No. 34-20, pp. 13-14.  Article 11 of the Articles of Association for the Fujian Group states that the SASAC "shall perform the duties of the capital subscriber and carry out supervision and management of the Company's assets."  R. Doc. No. 34-7, p. 12.  Article 12 specifically enumerates the supervisory duties of the capital subscriber. *Id.* at pp. 12-13.

[67] R. Doc. No. 34-1, ¶ 17(4).

[68] *Id.* at ¶¶ 28(1).

[69] R. Doc. No. 48-1.

[70] *Id.* at ¶¶ 20-21.

[71] *Id.* at ¶¶ 15-16, 21(1).

Committee and that he is now the Chief Deputy Mayor of Quanzhou City of Fujian Province.[72]

Mr. Lin further notes that the current legal representative of the Fujian Group previously served

as the Director of the Policy & Law Department of the SASAC.[73]

Based on the fact that the Fujian Group owns a majority interest in Mawei, Mr. Wang and

Mr. Lin conclude that Mawei is also effectively controlled by the Chinese government.[74]  Mr.

Wang's research revealed that Mawei is a joint-stock limited company and that the Fujian Group

directly owns 56.21% of the total share capital.[75]  Mr. Wang opines that Article 13 of the law of

SAE permits representatives appointed by SASAC, through its ownership in the Fujian Group, to

put forward proposals, present opinions, exercise voting rights, and report performance.[76]  Mr.

Lin further notes that the Fujian Group took the initiative to reconstruct Mawei, shares senior

management personnel with Mawei, and retains a majority interest in Mawei along with other

state-owned enterprises.[77]  Mr. Lin states that it is not unreasonable to conclude that Mawei is

effectively controlled by the government in proportion with the shares held by the PRC.[78]

Accepting these facts as true, and construing all disputed facts in FIC's favor, this Court

disagrees with FIC that the allegations in its petition along with the declarations of Mr. Wang

and Mr. Lin establish a *prima facie* case that this Court has jurisdiction over the Fujian

respondents.  The declarations of Mr. Wang and Mr. Lin establish only that the Fujian Group is

---

[72] *Id.* at ¶ 21.

[73] *Id.*

[74] R. Doc. No. 34-1, ¶ 28(2); R. Doc. No. 48-1, ¶ 29(2).

[75] R. Doc. No. 34-1, ¶ 21.

[76] *Id.* at ¶ 27.  Article 13 of the Law of SAE provides, "[T]he shareholder representative(s) appointed by a body performing the contributor's functions shall put forward proposals, present opinions and exercise the voting right under the instructions of the appointing body . . . ." R. Doc. No. 34-20, p. 12.

[77] R. Doc. No. 48-1, ¶ 27(1), (2), (4).

[78] *Id.* at ¶ 27(4).

100% owned by the PRC and that the SASAC appoints the board of directors and senior management personnel, and otherwise exercises the rights of a shareholder.   Although this certainly gives the Chinese government a significant amount of supervisory control over the entities, majority shareholding and the ability to appoint the board of directors cannot, without more, overcome the presumption of separateness.  *Hester*, 89 F.2d at 181; *see also NMR Capital, Ltd. v. The Republic of Argentina*, No. 09-7013, 2011 WL 524433 (S.D.N.Y. Feb 15, 2011).  The fact that some directors or officers may have also served as government officials does not show that those officials were acting to serve the interests of the sovereign in controlling the day-to-day operations of the entities.  *Foremost*, 905 F.2d at 448.  The declarations of Mr. Wang and Mr. Lin provide even less assistance in the highly fact-intensive control analysis as to Mawei, which they conclude is controlled by the government merely by virtue of the Fujian Group's ownership interest and its role in the restructuring of Mawei.

　　　FIC noticeably fails to show the requisite level of government involvement in the day-to-day operations of either the Fujian Group or Mawei.  Mr. Wang and Mr. Lin both expressly acknowledge the fact that the Fujian Group and Mawei possess operational and managerial authority over their respective companies.[79]  The Fujian respondents meanwhile provided declarations of their own setting forth uncontroverted facts that show a lack of government involvement in the day-to-day operations and management of the Fujian Group and Mawei.  The

---

[79] R. Doc. No. 34-1, ¶¶ 15, 25; R. Doc. No. 48-1, ¶¶ 19, 27(3).  In fact, Article 6 of the Articles of Association for the Fujian Group provides:

> The Company's objectives are to improve the economic effectiveness and realize the value preservation and appreciation of the Company's assets and the Company shall assume sole responsibility for its profits or losses *with operational autonomy, self-development, and self-discipline in accordance with the market demands.*

R. Doc. No. 34-7, p. 11 (emphasis added).

vice director of the Fujian Group's legal department and the vice general manager of Mawei

attest to the following facts, among others:

> (1) The employees of the Fujian Group and Mawei are paid by their respective companies and not by the State.
>
> (2) The entities file independent financial statements on behalf of their respective companies.
>
> (3) The entities are not financed by the PRC, except to the extent of the capital added to the company in exchange for share purchase.
>
> (4) The officers and directors of the Fujian Group and Mawei act in the best interest of their companies and are not primarily concerned with the interests of the PRC in its capacity as a foreign sovereign
>
> (5) The entities are responsible for their owns debts, which are not paid or guaranteed by the PRC.
>
> (6) The entities deal with the PRC as a third party, at arm's length, the same way it would deal with any other shareholder or company.
>
> (7) The entities manage their own daily operations, separate and apart from the PRC.[80]

Lin Yuanmin,[81] who provided a declaration in support of the Fujian respondents' motion

to dismiss, further attests that China is not liable for the debts of the Fujian Group and that if the

Fujian Group were to seek bankruptcy protection, it would go into liquidation without a buy-out

or take-over by the government.[82]  Lin Yuanmin states that the Fujian Group is entitled to

assume and discharge its civil liabilities using its assets and that the government would be liable

---

[80] R. Doc. No. 43-4; R. Doc. No. 43-5.

[81] Lin Yuanmin's declaration provides an address at the 14th Floor, Golden Finance Tower, 58 Yan'an Road East, Shanghai 200002, The People's Republic of China.  The parties have provided no further information as to Lin Yuanmin or his expertise with respect to Chinese law.

[82] R. Doc. No. 43-6, ¶¶ 11, 19.

for damages if it wrongfully infringed on its assets.[83] Lin Yuanmin agrees with Mr. Wang and

Mr. Lin that the SASAC exercises supervisory responsibilities as the sole investor in the Fujian

Group (and in proportion with its investment in Mawei), but he states that Chinese law does not

permit the local government to interfere with the independent operation of state-owned entities

such as the Fujian Group or private companies such as Mawei.[84]

The uncontroverted facts in this case stand in contrast to those in cases where courts have

disregarded a government instrumentality's separate juridical status.  In *TMR Energy*, for

example, the D.C. Circuit applied the reasoning in *Bancec* when finding that the State Property

Fund of Ukraine (SPF) was not a "person" entitled to due process protection.  411 F.3d at 301-

02.  The Court explained that the first provision of the regulations creating the SPF, which were

approved by the Supreme Rada (parliament), stated that "[t]he [SPF] is a body of the State which

implements national policies in the area of privatization." *Id.*  The second provision stated that

"[i]n the course of its activities, the [SPF] shall be subordinated and accountable to the Supreme

Rada . . . . The activities of the [SPF] shall be governed by the Constitution and legislative acts

of Ukraine, the Cabinet of Ministers of Ukraine and these Regulations." *Id.*  The Court further

noted that the SPF's chairman was "appointed and discharged by the President of Ukraine

subject to the consent of the Supreme Rada," and that the members of the board of directors had

---

[83] *Id.* at ¶ 18, 21. Article 7 of the Law of the People's Republic of China on State Compensation provides, "Where an administrative organ and its functionaries, in exercising their administrative powers, have infringed upon the lawful rights and interests of . . . a legal person or other organization, thereby causing damage to them, the administrative organ shall be the organ liable for compensation." R. Doc. No. 41-11.

[84] *Id.* at ¶¶ 21-25. Among other laws and regulations, Lin Yuanmin refers to Article 7 of the Supervision and Administration of State-owned Assets of Enterprises which provides, "State-owned assets supervision and administration authorities shall not carry out the public administration function of government."  R. Doc. No. 34-19. Article 10 further provides, "State-owned assets supervision and administration authorities shall support autonomous operation of enterprises in accordance with the law and may not interfere in the production and operation activities of enterprises except when carrying out their duties as investor." *Id.*  Article 16  of the Constitution of the People's Republic of China also provides, "State-owned enterprises have decision-making power with regard to their operation within the limits prescribed by law." R. Doc. No. 41-12.

to be "approved by the Presidium of the Supreme Rada." *Id.* Finally, the SPF's expenses were paid from the budget of the State of Ukraine. *Id.* The Court concluded that the State of Ukraine exercised such control over the SPF that it was "barely distinguishable from an executive department of the government." *Id.* The uncontroverted facts in this case fail to show that China exercised such plenary control over the operations of the Fujian Group and Mawei or that those entities otherwise amount to anything more than the "typical government instrumentality" described in *Bancec*.

This Court similarly rejects FIC's argument that the equitable principles applied by the Supreme Court in *Bancec* require that this Court disregard the separate juridical status of the Fujian respondents in order to avoid fraud and injustice. The dispute in *Bancec* arose when the Banco Para El Comercio Exterior de Cuba ("Bancec"), a financial institution established by the Cuban government, sought to collect on a letter of credit extended to First National Bank ("Citibank"). 462 U.S. at 613. The Cuban government seized and nationalized Citibank's assets just days after the Cuban bank gave notice of its intent to collect under the letter of credit. *Id.* at 614-15. While it recognized that Bancec had been established as an autonomous institution with full juridical capacity of its own, the Supreme Court held that Citibank was entitled to set-off the value of the assets seized by the Cuban government from the amounts owed to Bancec under the letter of credit. *Id.* at 632-33. The Court reasoned that giving separate effect to Bancec's separate juridical status under the circumstances would permit the Cuban government to obtain relief that it could not obtain without waiving its sovereign immunity and answering for its unlawful seizure of Citibank's assets. *Id.* Although China may be the ultimate beneficiary of the profits and losses of the Fujian respondents, declining to exercise jurisdiction over the Fujian Group and Mawei will not permit the kind of fraud and injustice at play in *Bancec* as FIC

suggests. *See, e.g.*, *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't. of Treasury*, 606 F. Supp. 2d 59, 77 (D.D.C. 2009) ("Cubaexport is not attempting to use the federal courts as a sword while invoking the Constitution as a shield—the type of incongruous result that gave the Supreme Court pause in [*Bancec*].").

Finally, the Court notes that the principles set forth in *Bancec* strongly counsel against dispensing with the presumption of separateness in this case. Permitting FIC to avoid the minimum contacts test on this record would set a highly undesirable precedent for the exercise of personal jurisdiction over any Chinese state-owned entity regardless of its contacts with the United States. Without more evidence of government involvement in the day-to-day operation and management of such entities, "freely ignoring the separate status" of Chinese state-owned entities in this manner would unjustifiably frustrate a sovereign nation's attempt to structure its activities "in a manner deemed necessary to promote economic development and efficient administration." *Bancec*, 462 U.S. at 626. Accordingly, the Court finds that FIC cannot avoid having to show that the Fujian respondents maintained sufficient contacts with the forum to justify the exercise of personal jurisdiction over the Fujian Group and Mawei.

## II. Subject Matter Jurisdiction to Enforce the Award against China

The foregoing analysis leads to the conclusion that this Court also lacks subject matter jurisdiction to enforce the arbitral award against China under the FSIA.[85] "The FSIA sets forth

---

[85] Although the Court reaches this conclusion *sua sponte*, the parties previously briefed the matter in connection with a motion to reconsider the entry of default entered against respondents. *See* R. Doc. Nos. 24, 25, 29, 34. This Court vacated the default against the Fujian respondents, but it did not vacate the default against China. R. Doc. No. 40. The Court explained that the Fujian respondents lacked standing to raise the defense of sovereign immunity on behalf of China because jurisdiction did not depend on China's presence at that time. *Id.* This Court also explained, however, that it may address the issue of subject matter jurisdiction independently when jurisdiction rests on the presence of a foreign state. *Id.*; *See Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999)); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983).

Having dismissed the claims against the Fujian respondents, this Court's jurisdiction over the remaining claims rests solely on the presence of a foreign state. Accordingly, this Court must now independently determine whether it has

'the sole and exclusive standards to be used' to resolve all sovereign immunity issues raised in federal and state courts." *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 532 (5th Cir. 1992) (citing H.R. Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), U.S. Code Cong. & Admin. News 1976, pp. 6604, 6610)). "The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts." *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994); 28 U.S.C. § 1604. Subject matter jurisdiction over a foreign state exists under the FSIA only when one of the exceptions to foreign sovereign immunity applies. 28 U.S.C. § 1330(a); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983)). "[U]nless a specified exception applies, a federal court lacks subject matter jurisdiction over a claim against a foreign state." *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 215 (5th Cir. 2009) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993)). The arbitration exception provides the only possible exception to foreign sovereign immunity in this case. *See* 28 U.S.C. § 1605(a)(6).[86]

---

subject matter jurisdiction to enforce the award against China. *See Verlinden*, 461 U.S. at 488-89 ("[E]ven if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]").

[86] 28 U.S.C. § 1605(a)(6) provides as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

FIC's ability to enforce the arbitral award against China—which was not a party to the arbitration—depends upon its argument that this Court should disregard the separate juridical status of the Fujian Group and Mawei. "Although *Bancec*'s description of the basis for disregarding the separate juridical status of foreign agencies occurred in a discussion of substantive liability, its principles have been applied to FSIA jurisdictional issues." *Arriba Ltd.*, 962 F.2d at 533-34; *Foremost-McKesson, Inc.*, 905 F.2d at 446; *Walter Fuller Aircraft Sales, Inc. v. Republic of Phil.*, 965 F.2d 1375, 1381-83 (5th Cir. 1992); *Hester*, 879 F.2d at 176. "[W]here, as here, jurisdiction depends on an allegation that the particular defendant was an agent of the sovereign, the plaintiff bears the burden of proving this relationship." *Arriba Ltd.*, 962 F.2d at 533-34. This Court has already found that FIC failed to overcome the presumption established in *Bancec* that the Fujian respondents should retain their status as judicial entities separate and apart from the PRC. As China was not otherwise a party to the arbitration proceedings, the arbitration exception to foreign sovereign immunity does not apply. Accordingly, this Court lacks subject matter jurisdiction over the claims against China.

Despite FIC's argument that this Court should not dismiss its claims against China without allowing for jurisdictional discovery as to China's relationship with the Fujian respondents,[87] *see, e.g.*, *Walter Fuller*, 965 F.2d at 1383 (remanding for further fact finding with respect to the government's involvement in the affairs of its instrumentality), the Fifth Circuit has made clear that "unlimited jurisdictional discovery is *not* permitted as a matter of course." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (emphasis in original). "FSIA immunity is immunity not only from liability, but also from the costs, in time

---

[87] FIC sets forth this argument in its opposition to the Fujian respondents' earlier motion to vacate the entry of default. R. Doc. No. 25, pp. 12-13. FIC never requested an opportunity to conduct jurisdictional discovery with respect to this Court's authority to exercise personal jurisdiction over the Fujian Group or Mawei.

and expense, and other disruptions attendant to litigation." *Id.* Jurisdictional discovery cannot be conducted "consonant with the comity envisioned by the FSIA" unless it is "ordered circumspectly and only to verify allegations of *specific facts* crucial to an immunity determination." *Arriba*, 962 F.2d at 534 & n.17 (emphasis added).

The cases recognized by the Fifth Circuit as warranting jurisdictional discovery involved "allegations of *specific facts* that, if proved, sustained a nexus between particularized [non-immune] activity and the claims asserted by the plaintiff." *Id.* (emphasis in original) (citing *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 453 (6th Cir. 1988) (authorizing discovery to verify whether or not a theft of trade secrets had been accomplished through negotiations in the United States with plaintiff's former employer); *Gilson v. Republic of Ir.*, 682 F.2d 1022 (D.C. Cir. 1982) (authorizing discovery to verify whether or not the Republic of Ireland and companies owned by the it had enticed the plaintiff to work in Ireland in order to steal his patent rights); *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332-33 (2d Cir. 1990) (authorizing discovery to determine whether or not a Soviet entity negligently overhauled a Polish aircraft); *Foremost-McKesson*, 905 F.2d at 446-49 (remanding for further fact-finding to verify the "complaint allegations which, although conclusory, would amount to the degree of control necessary to attribute the actions of the co-defendants to the Government of Iran.")). Jurisdictional discovery is not warranted where a plaintiff fails to allege facts which, if true, would show that a particular defendant was not entitled immunity. *Kelly*, 213 F.3d at 849-51; *Arriba*, 962 F.2d at 534 ("[B]ecause Arriba's allegations do not satisfy *Bancec*, permitting discovery will not cure the FSIA jurisdictional discovery.").

In this case, the generalized allegations that the Chinese government exercised control over the Fujian respondents do not provide facts which, if true, would satisfy *Bancec*. FIC has

not alleged facts establishing a nexus between particularized government activities and the management of the Fujian respondents sufficient to establish the requisite level of control. While the evidence submitted in connection with this motion does elaborate on the general ownership and corporate structure of the entities, it fails to bridge the gap by showing that government officials were implementing government policy by managing the daily affairs of the Fujian respondents, much less in connection with any particular transactions or series of events. Accordingly, the Court does not find that permitting jurisdictional discovery under these circumstances would "cure the FSIA jurisdictional deficiency." *See Arriba*, 962 F.2d at 537.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion to dismiss is **GRANTED.** The petition to enforce the arbitral award is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that this Court's previous order[88] entering an entry of default against the People's Republic of China is **VACATED**.


New Orleans, Louisiana, March 9, 2012.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[88] R. Doc. No. 40.